UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES CAOUETTE, *et al.*, | No. C-12-1814 EMC |
| Plaintiffs, | **RELATED TO** |
| v. | No. C-12-1815 EMC |
| BRISTOL-MYERS SQUIBB COMPANY, *et al.*, | No. C-12-1816 EMC |
| | No. C-12-1818 EMC |
| | No. C-12-1819 EMC |
| | No. C-12-1820 EMC |
| Defendants. | No. C-12-1821 EMC |
| _____/ | No. C-12-1822 EMC |
| AND ALL RELATED ACTIONS. | |
| _____/ | **ORDER GRANTING PLAINTIFFS' MOTION TO REMAND** |

Currently pending before the Court are eight related cases in which the Plaintiffs have sued Bristol-Myers Squibb Company and McKesson Corporation. In each case, the Plaintiffs make essentially the same exact allegations and the same exact claims. In each case, Bristol-Myers removed and, subsequently, the plaintiffs filed a motion to remand.[1] The arguments in the motions

---

[1] The cases and the docket numbers for the motions to remand are provided below.

(1) No. C-12-1814 EMC *Caouette* (Docket No. 25)
(2) No. C-12-1815 EMC *Anderson* (Docket No. 17)
(3) No. C-12-1816 EMC *Bryan* (Docket No. 14)
(4) No. C-12-1818 EMC *Applen* (Docket No. 20)
(5) No. C-12-1819 EMC *Adams* (Docket No. 16)
(6) No. C-12-1820 EMC *Alexander* (Docket No. 16)
(7) No. C-12-1821 EMC *Bales* (Docket No. 16)
(8) No. C-12-1822 EMC *Ailes* (Docket No. 16)

to remand are all the same. For ease of reference, the Court shall cite to the parties and papers in the *Caouette* case (the lowest-numbered case) only.

Having considered the parties' briefs, including all supplemental briefing, as well as the oral argument of counsel, the Court hereby **GRANTS** the motions to remand.

## I. FACTUAL & PROCEDURAL BACKGROUND

In their complaint, the *Caouette* Plaintiffs (91 individuals total) allege as follows.

Plavix is a drug that was designed and manufactured by Bristol-Myers and marketed, sold, and distributed by McKesson. *See* Compl. ¶ 1. Defendants represented that Plavix provided greater cardiovascular benefits than aspirin and was also easier on a person's stomach. *See* Compl. ¶ 111. In fact, Plavix was not more efficacious than aspirin in preventing heart attacks and strokes; further, there were risks in taking Plavix, including suffering a heart attack stroke, internal bleeding, and death. *See* Compl. ¶ 112. Defendants knew or should have known of both of these things. *See* Compl. ¶¶ 111-12. The *Caouette* Plaintiffs suffered damages arising from their use of Plavix as designed and manufactured by Bristol-Myers and marketed, sold, and distributed by McKesson. *See* Compl. ¶ 1.

Based on, *inter alia*, the above allegations, the *Caouette* Plaintiffs have asserted the following claims: (1) strict products liability – design defect; (2) strict products liability – manufacturing defect; (3) negligence; (4) breach of implied warranty; (5) breach of express warranty; (6) deceit by concealment; (7) negligent misrepresentation; (8) fraud by concealment; (9) violation of California Business & Professions Code § 17200; (10) violation of California Business & Professions Code § 17500; (11) violation of California Civil code § 1750 (the Consumer Legal Remedies Act); and (12) loss of consortium.[2]

The *Caouette* Plaintiffs filed their lawsuit against Defendants in March 2012. Bristol-Myers subsequently removed the case to federal court, apparently before McKesson made any appearance in the action. As of date, McKesson has yet to make an appearance in this lawsuit.

---

[2] The claim for loss of consortium has been brought by only those plaintiffs who were spouses of persons who ingested Plavix. *See* Compl. ¶ 225.

2

## II. DISCUSSION

A. Legal Standard

> A defendant may remove an action to federal court based on federal question jurisdiction or diversity jurisdiction. However, "'[i]t is to be presumed that a cause lies outside [the] limited jurisdiction [of the federal courts] and the burden of establishing the contrary rests upon the party asserting jurisdiction.'" The "strong presumption against removal jurisdiction means that the defendant always has the burden of establishing that removal is proper," and that the court resolves all ambiguity in favor of remand to state court.

*Hunter v. Philip Morris USA*, 582 F.3d 1039, 1042 (9th Cir. 2009).

In the instant case, Bristol-Myers argues the following: (1) There is diversity jurisdiction over the *Caouette* action (and the other seven related cases) because the *Caouette* Plaintiffs fraudulently joined McKesson to the lawsuit; and (2) there is subject matter jurisdiction over the *Caouette* action (and the other seven related cases) by virtue of the Class Action Fairness Act ("CAFA"). Bristol-Myers also makes an argument specific the *Bryan* case alone, *i.e.*, there is diversity jurisdiction once the Court ignores the citizenship of some of the plaintiffs in the action. Each of these contentions is addressed below.

B. Diversity Jurisdiction – Fraudulent Joinder

Some of the *Caouette* Plaintiffs are citizens of California and McKesson is in part a citizen of California as well. Thus, as a facial matter, there can be no diversity jurisdiction in the *Caouette* action (*i.e.*, no complete diversity). Bristol-Myers contends, however, that the Court should ignore the citizenship of McKesson because the *Caouette* Plaintiffs fraudulently joined the company to the lawsuit.

The Ninth Circuit has specified that "[j]oinder is fraudulent [i]f the plaintiff fails to state a cause of action against a resident defendant, and the failure is obvious according to the settled rules of the state." *Id.* (internal quotation marks omitted); *see also Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1068 (9th Cir. 2001) (stating that, "[i]n light of [plaintiff's] own admission, it is abundantly obvious that she could not possibly prevail on her negligent misrepresentation claim against Consultants"); *Dodson v. Spiliada Maritime Corp.*, 951 F.2d 40, 42 (5th Cir. 1992) (stating that, "[t]o prove their allegation of fraudulent joinder [the defendants] must demonstrate that there is

3

no possibility that Dodson would be able to establish a cause of action against them in state court"). Or, as stated in the Moore's treatise, "[j]oinder will not be deemed fraudulent unless there clearly can be no recovery under state law on the cause alleged or on the facts as they exist when the petition to remand is heard." 15-102 Moore's Fed. Prac. – Civ. § 102.21[5][a]. In the case at bar, Bristol-Myers maintains that it is obvious that the *Caouette* Plaintiffs have no viable state claims against McKesson because (1) those state claims are all preempted pursuant to the Supreme Court's decision in *Pliva, Inc. v. Mensing*, 131 S. Ct. 2567 (2011); and (2) the *Caouette* Plaintiffs have failed to allege that they ingested Plavix that was actually distributed by McKesson, as opposed to another company.

1. Preemption

*Mensing* is a case involving impossibility preemption. There, the Supreme Court held that state law claims for failure to warn, which were asserted against generic drug manufacturers, were preempted because generic drug manufacturers had a federal duty to make sure the labels for their generic drugs were the same as the labels for the brand name drugs and therefore they could not make any additional or different warnings as required by state law.

Here, Bristol-Myers argues that impossibility preemption should also apply. Bristol-Myers contends that the claims here are, in essence, state law claims for failure to warn but that McKesson, as distributor, could not change the labels on the drugs[3] to make additional or different warnings as required by state law; otherwise, it would be subject to civil or criminal penalties under federal law.

In addressing Bristol-Myers's argument, the Court must first begin with its contention that the claims asserted by the *Caouette* Plaintiffs amount to claims for failure to warn. While some of the claims are fairly characterized as such (*e.g.*, fraud by concealment and violation of § 17200[4]),

---

[3] In *Mensing*, the Supreme Court deferred to the Food & Drug Administration's position that a "Dear Doctor" letter – *i.e.*, a letter that provides a warning to physicians and other healthcare professionals – also constitutes labeling. *See Mensing*, 131 S. Ct. at 2576.

[4] In the fraud-by-concealment claim, the *Caouette* Plaintiffs allege that "Defendants had the duty and obligation to disclose to Ingesting Plaintiffs and to their physicians and healthcare providers the true facts concerning Plavix, which facts include . . . the fact that concurrent use with aspirin would cause serious bodily injuries, including . . . serious abnormal bleeding, TTP, and death." Compl. ¶ 194.

4

there are also claims that cannot be so characterized, in particular, the claim for strict liability based on a design defect. Under California law, there are two

> two alternative tests for identifying a design defect: first, whether the product performed as safely as an ordinary consumer would expect when used in an intended and reasonably foreseeable manner and, second, whether on balance the benefits of the challenged design outweighed the risk of danger inherent in the design.

*Anderson v. Owens-Corning Fiberglas Corp.*, 53 Cal. 3d 987, 995 (1991). Clearly, under either test, a failure to warn is immaterial.

In response, Bristol-Myers argues that the design defect claim clearly has no viability, and therefore this points to fraudulent joinder. *See* Docket No. 49 (Def.'s Supp. Br. at 6). In support of this argument, it cites to *Brown v. Superior Court*, 44 Cal. 3d 1049 (1988). There, the California Supreme Court "decline[d] to hold . . . that a drug manufacturer's liability for injuries caused by the defective design of a prescription drug should be measured by the standard set forth [above]." *Id.* at 1065. Instead, it held that "a manufacturer is not strictly liable for injuries caused by a prescription drug so long as the drug was properly prepared and accompanied by warnings of its dangerous propensities that were either known or reasonably scientifically knowable at the time of distribution." *Id.* at 1069. Significantly, the Court decided to impose the less harsh standard for liability because of policy concerns. It explained that imposition of the harsher standard would hamper the development and marketing of beneficial new drugs – *e.g.*, because to make a safer drug, the manufacturer may have to withhold the drug "from the market until scientific skill and knowledge advanced to the point at which additional dangerous side effects would be revealed." *Id.* at 1063. The Court also noted that,

---

In the § 17200 claim, the *Caouette* Plaintiffs allege that Defendants "[r]epresent[ed] that Plavix is safe, fit, and effective for human consumption, knowing that said representations were false, and concealing that Plavix products had a serious propensity to cause injuries to users." Compl.¶ 203(a). The *Caouette* Plaintiffs also allege that Defendants improperly "refrain[ed] from taking any action that would provide prescribing physicians with appropriate information and protect patients who ingest or use their drugs . . . , such as failing to . . . updat[e] labels and timely and properly implement[] label changes" and failing to "tak[e] appropriate action to disseminate to prescribing physicians and healthcare providers appropriate and permitted product information and labels concerning safety issues and safe prescribing practices for their products." Compl. ¶ 203(e).

> [i]f drug manufacturers were subject to strict liability, they might be reluctant to undertake research programs to develop some pharmaceuticals that would prove beneficial or to distribute others that are available to be marketed, because of the fear of large adverse monetary judgments. Further, the additional expense of insuring against such liability – assuming insurance would be available – and of research programs to reveal possible dangers not detectable by available scientific methods could place the cost of medication beyond the reach of those who need it most.

*Id.* Although, on its face, *Brown* addressed liability of prescription drug manufacturers, the same policy concerns would be equally applicable to distributors of such drugs. Neither party has submitted any authorities holding drug distributors should be treated any differently from drug manufacturers under *Brown*.

While the Court does not necessarily disagree with Bristol-Myers's contention that *Brown* makes a design defect claim against McKesson unavailable, Bristol-Myers fails to take into account that *Brown* would also make a design defect claim against *it* unavailable. In other words, this is a "unique situation when the same analysis applied to an assertion of fraudulent joinder applies to all defendants." *Hunter*, 582 F.3d at 1044. The Ninth Circuit has explained that,

> "[i]n such cases, it makes little sense to single out the in-state defendants as 'sham' and call their joinder improper. In such circumstances, the allegation of improper joinder is actually an attack on the merits of plaintiff's case as such – an allegation that . . . 'the plaintiff's case [is] ill founded as to all the defendants.'"

*Id.* at 1044-45 (quoting *Smallwood v. Illinois Central R.R. Co.*, 385 F.3d 568, 574 (5th Cir. 2004) (en banc)). The merits issue then, as applied to all defendants, is one for the state court to decide. *See id.* at 1045; *see also Smallwood*, 385 F.3d at 575 (stating that, "[w]hen the only proffered justification for improper joinder is that there is no reasonable basis for predicting recovery against the in-state defendant, and that showing is equally dispositive of all defendants rather than to the in-state defendants alone, the requisite showing has not been made"). Thus, under *Hunter*, the state court – and not this Court – must decide the merits issue of whether *Brown* is a bar to the claims against both Bristol-Myers and McKesson alike.

The Court acknowledges that Bristol-Myers has made a secondary argument – *i.e.*, that, even if a design defect claim were not precluded by *Brown*, impossibility preemption under *Mensing* would still apply to the claim, thus establishing fraudulent joinder of McKesson. *See* Docket No. 46

6

(Def.'s Supp. Br. at 6). The preemption argument would be applicable to McKesson alone, and not Bristol-Myers. However, Bristol-Myers has, as an initial matter, put at issue the viability of the design defect claim on a basis that is applicable to *both* McKesson and it alike. Thus, Bristol Myers's secondary argument does not obviate the *Hunter* problem.

Even if the Court were to reach the merits of the preemption claim, it is not obvious that *Mensing* impossibility preemption would apply to a design defect claim. *Mensing* did not involve any such claim; it involved a failure-to-warn claim. While some district courts have held that *Mensing* impossibility preeemption applies not only to a failure-to-warn claim but also to a design defect claim, *see, e.g.*, *In re Pamidronate Prods. Liab. Litig.*, No. 09–MD–2120(KAM)(SMG), 2012 WL 272889, at *3 (E.D.N.Y. Jan. 30, 2012); *In re Fosamax Prods. Liab. Litig. (No. II)*, No. Civ. 08-008 (GEB-LHG), 2011 WL 5903623, at *6 (D.N.J. Nov. 21, 2011), the First Circuit has declined to so extend *Mensing*. *See Bartlett v. Mutual Pharm. Co.*, 678 F.3d 30, 38 (1st Cir. 2012) ("conclud[ing] that the [Supreme] Court adopted a general no-preemption rule in *Wyeth* [*v. Lane*, 555 U.S. 555 (2009)] and that it is up to the Supreme Court to decide whether [*Mensing*'s] exception is to be enlarged to include design defect claims [against generic manufacturers]"); *see also Halperin v. Merck, Sharpe & Dohme Corp.*, No. 11 C 9076, 2012 U.S. Dist. LEXIS 50549 (N.D. Ill. Apr. 10, 2012) (explaining why design defect claims might be treated differently from failure-to-warn claims, particularly outside of the generic drug context).

Accordingly, remand is required under *Hunter*.[5]

2. Allegations Regarding McKesson's Distribution of Plavix to *Caouette* Plaintiffs

Bristol-Myers argues that, even if the state-law claims against McKesson are not preempted pursuant to *Mensing*, the *Caouette* Plaintiffs still have no viable claims against McKesson because they have not specifically alleged that the Plavix they ingested was actually distributed by McKesson, as opposed to another company.

---

[5] In view of this conclusion, the Court need not reach the question whether *Mensing* preempts the failure-to-warn claim against McKesson.

1 The Court rejects this argument as well. While the *Caouette* Plaintiffs could have made

2 clearer allegations to that effect, the allegations that they have in the complaint are enough. They

3 have alleged:

> *This action involves claims of personal injury, economic damages, punitive damages, and other claims of damage arising from the use of Plavix, a pharmaceutical compound* researched, designed, formulated, compounded, tested, manufactured, produced, processed assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed[,] or otherwise placed in the stream of commerce by Defendant BRISTOL-MYERS SQUIBB COMPANY ("BMS") and *marketed, sold, and distributed by Defendant MCKESSON CORPORATION ("McKesson") . . . .*

9 Compl. ¶ 1 (emphasis added). As indicated by the language italicized above, the *Caouette* Plaintiffs

10 have alleged that their damages arose from their use of Plavix distributed by McKesson.

11 The fact that Plavix has distributors other than McKesson (approximately twenty) is not

12 controlling. *See* Docket No. 5 (May Decl. ¶ 3) (testifying that Bristol-Myers "has at least twenty

13 wholesale distributors of Plavix throughout the United States, and five in California alone, including

14 McKesson Corporation[;] McKesson is one of many – not the exclusive – distributors of Plavix to

15 pharmacies, healthcare facilities, and hospitals"). The *Caouette* Plaintiffs are not required to sue all

16 distributors.

17 C. Diversity Jurisdiction in *Bryan* Action

18 As to the *Bryan* action alone, Bristol-Myers advances one additional argument in favor of

19 diversity jurisdiction. More specifically, Bristol-Myers notes that, in the *Bryan* case, some of the

20 plaintiffs are citizens of New York, just as Bristol-Myers is (in part) a citizen of New York; thus,

21 there is no complete diversity. Bristol-Myers contends, however, that the New York citizens should

22 be ignored for purposes of evaluating diversity jurisdiction because they were "fraudulently

23 misjoined." Opp'n at 13. Fraudulent – also known as procedural misjoinder –

> focuses on whether the jurisdictional spoiler has been properly joined under state or federal joinder rules. The doctrine provides that federal courts may sever an improperly joined party *before* assessing the propriety of removal. If the remaining properly joined parties are completely diverse, the court retains that portion of the case and remands the rest of the case to state court.

*In re Yasmin & Yaz Mktg., Sales Pracs. & Prods. Liab. Litig.*, 779 F. Supp. 2d 846, 853 (S.D. Ill. 2011).

The doctrine of fraudulent misjoinder appears to have first been articulated by the Eleventh Circuit in *Tapscott v. MS Dealer Service Corporation*, 77 F.3d 1353, 1360 (11th Cir. 1996). *See* Wright, *et al.*, Fed. Prac. & Proc. § 3723. "Affirming the district court, the Eleventh Circuit found that the factual commonality among the claims of the plaintiffs against the different classes of defendants was insufficient to satisfy Federal Civil Rule 20,[6] and thus some defendant classes were misjoined."[7] *Id.* The court noted that procedural misjoinder could be "'just as fraudulent as the joinder of a resident defendant against whom a plaintiff has no possibility of a cause of action. A defendant's "right of removal cannot be defeated by a fraudulent joinder of a resident defendant having no real connection with the controversy."'" *Id.* While *Tapscott* involved the procedural misjoinder of a defendant, other courts have subsequently applied the doctrine to cover any procedural misjoinder, which includes a plaintiff fraudulently misjoining a nondiverse plaintiff in order to defeat diversity jurisdiction. *See id.* (citing *In re Rezulin Prods. Liab. Litig.*, 168 F. Supp. 2d 136, 148 (S.D.N.Y. 2001) (finding misjoinder of plaintiffs and severing misjoined plaintiffs for purposes of maintaining the defendants' right to removal of the remainder of the action)).

Several district courts have followed *Tapscott* and its progeny. *See Prempro*, 591 F.3d at 621 (citing cases); *In re Yasmin & Yaz*, 779 F. Supp. 2d at 854 (citing cases). The Fifth Circuit also seems to have indicated agreement with *Tapscott*. *See Crockett v. R.J. Reynolds Tobacco Co.*, 436 F.3d 529, 533 (5th Cir. 2006). But other than the Eleventh and Fifth Circuits, no other circuit court has adopted the fraudulent misjoinder doctrine. The Ninth Circuit, for example, has acknowledged

---

[6] Federal Rule of Civil Procedure 20 governs permissive joinder. "Persons . . . may be joined in one action as defendants" so long as "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2).

[7] The Court notes that "[w]hether the federal or state rules on joinder apply has . . . received conflicting results post-*Tapscott*." *In re Prempro Prods. Liab. Litig.*, 591 F.3d 613, 622 n.6 (8th Cir. 2010). It appears that "most courts looking at this issue have applied the state rule. This seems the better choice since the question is whether the parties were misjoined in state court." *Osborn v. Metro. Life Ins. Co.*, 341 F. Supp. 2d 1123, 1128 (E.D. Cal. 2004).

the doctrine in an unpublished decision predating January 1, 2007, but has not expressly adopted it. *See California Dump Truck Owners Ass'n v. Cummins, Engine Co., Inc.*, 24 Fed. Appx. 727, 729 (9th Cir. 2001) ("assum[ing], without deciding, that this circuit would accept the doctrines of fraudulent and egregious joinder as applied to plaintiffs"). The same is true of the Tenth and Eighth Circuits. *See Lafalier v. State Farm Fire & Cas. Co.*, 391 Fed. Appx. 732, 739 (10th Cir. 2010) (statin that "[t]here may be many good reasons to adopt procedural misjoinder, . . . [b]ut we need not decide that issue today, because the record before us does not show that adopting the doctrine would change the result in this case"); *Prempro*, 591 F.3d at 622 (stating that, "even if adopted the doctrine, the plaintiffs' alleged misjoinder in this case is not so egregious as to constitute fraudulent misjoinder"). Furthermore, several district courts "have criticized *Tapscott*, arguing that questions of joinder under state law do not implicate federal subject matter jurisdiction, federal jurisdiction is to be narrowly construed, and the fraudulent misjoinder doctrine has created an unpredictable and complex jurisdictional rule." *Id.* at 621-22 (citing cases); *see also In re Yasmin & Yaz*, 779 F. Supp. 2d at 854-55 (citing cases). "Many of these courts also opine that the better approach is for parties to seek severance in state court prior to removal." *Id.* at 855.

While the reasoning in these district court cases is persuasive, ultimately, the Court need not decide whether or not to endorse the *Tapscott* rule. This is because even if it were to adopt the fraudulent misjoinder doctrine, "the plaintiffs' alleged misjoinder in this case [of nondiverse plaintiffs] is not so egregious as to constitute fraudulent misjoinder." *Prempro*, 591 F.3d at 622. "[A]bsent evidence that plaintiffs' misjoinder borders on a 'sham,' [the Court] decline[s] to apply *Tapscott* to the instant case." *Id.* at 624. In the case at bar, there is nothing to suggest that the New York plaintiffs are sham plaintiffs; there is nothing to indicate, for example, that they did not ingest Plavix and suffer injury as a result.

D.     CAFA Jurisdiction

Finally, as to all of the eight actions, Bristol-Myers argues that there is jurisdiction pursuant to CAFA. CAFA provides for federal jurisdiction over not only certain class actions but also certain "mass actions." *See* 28 U.S.C. § 1332(d)(11)(A) (providing that "a mass action shall be deemed to be a class action removable under paragraphs (2) through (10) if it otherwise meets the provisions of

those paragraphs"). The term "mass action" is defined in CAFA as a civil action "in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact." *Id.* § 1332(d)(11)(B)(i) (adding that "jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a) – *i.e.*, the $75,000 amount-in-controversy requirement). Bristol-Myers admits that, in each of the eight cases at issue, the number of plaintiffs is less than one hundred. However, Bristol-Myers points out, if the Court were to aggregate the eight cases, then the number of plaintiffs would clearly exceed one hundred. *See* Opp'n at 17 (indicating that the plaintiffs in all eight cases number 659). Bristol-Myers maintains that the Court should aggregate the cases because the plaintiffs in the eight actions have essentially brought the same case but split up the actions solely for the purpose of avoiding federal jurisdiction. In essence, Bristol-Myers argues that the Court should look through the procedural gamesmanship of Plaintiffs and deem the eight cases together one mass action.

While Bristol-Myers's position is not without any force, it has been foreclosed by the Ninth Circuit's decision in *Tanoh v. Dow Chemical Co.*, 561 F.3d 945 (9th Cir. 2009). In *Tanoh*, the issue was "whether seven individual state court actions, each with fewer than one hundred plaintiffs, should be treated as one 'mass action' eligible for removal to federal court under CAFA." *Id.* at 952. The court concluded that the answer was no. In so holding, the Ninth Circuit started off by looking at the plain language of the statute. It noted:

> CAFA's "mass action" provision applies only to civil actions in which the "monetary relief claims of 100 or more persons are proposed to be tried jointly." By its plain terms, § 1332(d)(11) therefore does not apply to plaintiffs' claims in this case, as none of the seven state court actions involves the claims of one hundred or more plaintiffs, and neither the parties nor the trial court has proposed consolidating the actions for trial.

*Id.* at 953.

The court also pointed out that other provisions of CAFA undercut the defendant's position that the seven cases should be aggregated together and deemed one mass action. For example, under CAFA, "the term 'mass action' shall not include any civil action in which . . . the claims are joined

11

*upon motion of a defendant.*" 28 U.S.C. § 1332(d)(11)(B)(ii)(II) (emphasis added). The Ninth Circuit stated that,

> [i]n light of this statutory directive, we fail to see how the result could be any different in a case such as this one, in which Dow – while never formally moving to consolidate plaintiffs' claims – urges us to treat those claims as if they should have been consolidated for purposes of removal under CAFA. The absence of a formal motion cannot blink away the fact that Dow, the defendant, is asking us to consolidate separate actions for purposes of applying the "mass action" provision.

*Tanoh*, 561 F.3d at 953-54.

As another example, CAFA also provides that "the term 'mass action' shall not include any civil action in which . . . the claims have been consolidated or coordinated *solely for pretrial proceedings.*" 28 U.S.C. § 1332(d)(11)(B)(ii)(IV) (emphasis added). "This provision reinforces [the] conclusion that Congress intended to limit the numerosity component of mass actions quite severely by including only actions in which *the trial itself* would address the claims of at least one hundred plaintiffs." *Tanoh*, 561 F.3d at 954 (emphasis added).

Notably, the Ninth Circuit went on to find unpersuasive the defense argument that plaintiffs were artificially structuring their lawsuits solely to avoid federal jurisdiction. The court noted that, even assuming (as the defendant argued) "CAFA's primary purpose was to prevent plaintiffs' lawyers from abusing the class action device, often by filing several 'copycat' actions alleging the same injuries on behalf of the same class of plaintiffs in different state courts," such concerns were inapplicable in a case such as the one before it "in which seven *different* groups of plaintiffs, none of which purport to represent a nationwide class, allege the same injuries in the *same* court." *Id.* (emphasis in original).

Finally, the Ninth Circuit distinguished cases in which courts had found federal jurisdiction based on CAFA because of artificial structuring of lawsuits by plaintiffs. First, those cases did not address CAFA's mass action or numerosity provisions. *See id.* at 955 (noting that those cases were class actions and that, in those cases, "it was undisputed that both plaintiff classes easily exceeded CAFA's one hundred plaintiff threshold"). Second, those cases "involved plaintiffs who attempted to split their claims into multiple suits covering discrete time periods so as to expand their recovery without triggering CAFA's $5 million amount in controversy requirement." *Id.* at 955. There was

no colorable reason to divide the cases up by time other than to avoid federal jurisdiction. *See id.* The Ninth Circuit explained that "[t]he concerns animating [those cases] simply not present in this case, as none of the seven groups of plaintiffs has divided its claims into separate lawsuits to expand recovery. To the contrary, each of the seven state court actions was brought on behalf of a *different* set of plaintiffs, meaning that none of the plaintiff groups stands to recover in excess of CAFA's $5 million threshold between the seven suits." *Id.* (emphasis added).

In light of *Tanoh*, Bristol-Myers's main arguments in its opposition brief are unavailing. To the extent Bristol-Myers argues that *Tanoh* is distinguishable because, there, the defendant was the one proposing to aggregate, the situation is no different here. Bristol-Myers is the one proposing to aggregate, not the plaintiffs in the eight actions. While the plaintiffs did seek to relate the cases, under CAFA, "the term 'mass action' shall not include any civil action in which . . . the claims have been consolidated or coordinated *solely for pretrial proceedings*." 28 U.S.C. § 1332(d)(11)(B)(ii)(IV) (emphasis added). The request to relate cannot be deemed a request to join claims for trial.[8]

Finally, Bristol-Myers's reliance on *Bullard v. Burlington Northern Santa Fe Railway Co.*, 535 F.3d 759 (7th Cir. 2008), is unavailing, too. In *Tanoh*, the Ninth Circuit distinguished *Bullard*, pointing out that,

> [i]n that case, 144 plaintiffs sought damages for exposure to chemicals that had allegedly escaped from a nearby wood-processing plant. The court held that by filing a complaint on behalf of 144 residents injured by the leak, plaintiffs had proposed jointly trying the claims of one hundred or more people, triggering removal under CAFA. The Seventh Circuit had no occasion to consider whether multiple state court actions involving fewer than one hundred plaintiffs could be removed under CAFA as a single mass action, as plaintiffs' complaint in *Bullard*, on its face, asserted claims on behalf of more than one hundred individuals.

---

[8] In *Tanoh*, the Ninth Circuit indicated that the seven cases could become removable "if plaintiffs seek to join the claims for trial." *Tanoh*, 561 F.3d at 956; *see also Anderson v. Bayer Corp.*, 610 F.3d 390, 394 (7th Cir. 2010) (stating that "[s]uch a request from the plaintiffs seems possible (perhaps even likely) at some future point in these cases, given the similarity of their claims[,] [b]ut it is not yet a certainty, and Congress has forbidden us from finding jurisdiction based on Bayer's suggestion that the claims be tried together[;] [s]o long as plaintiffs (or perhaps the state court) do not propose to try these cases jointly in state court, they do not constitute a mass action removable to federal court").

13

*Tanoh*, 561 F.3d at 956 n.6.

### III. CONCLUSION

For the foregoing reasons, the Court agrees with the plaintiffs in the eight related cases that subject matter jurisdiction in each case is lacking. The Court emphasizes that there is a "'strong presumption against removal jurisdiction'" and "all ambiguit[ies] [are resolved] in favor of remand to state court." *Hunter*, 582 F.3d at 1042. Accordingly, the plaintiffs' motions to remand are granted.

The Clerk of the Court is instructed to enter a judgment in each of the eight cases in accordance with this opinion and close the file in the case.

IT IS SO ORDERED.

Dated: August 10, 2012

_____
EDWARD M. CHEN
United States District Judge